## MANNING *v.* ROSENFELD.

1. MORTGAGES—VALIDITY OF MORTGAGE.

A mortgage given by the owner of a building to one who signed notes to pay the contractors, with the understanding that the mortgage should be sold and the proceeds used to pay the notes, was valid.

2. SAME — ASSIGNEES OF MORTGAGE WITHOUT NOTICE OF UNDERSTANDING BONA FIDE PURCHASERS.

Where none of the notes were due at the time the mortgage was assigned, and the assignees had no notice of the understanding that the proceeds were to be used to pay said notes, they were *bona fide* purchasers.

[1]Mortgages, 41 C. J. § 199; [2]Id., 41 C. J. § 711.

3. SAME—SUBSEQUENT DEFENSES DO NOT AFFECT RIGHTS OF BONA FIDE ASSIGNEES.

Equities and defenses between the original parties arising after the assignment do not affect the rights of an assignee of a mortgage.

4. SAME — SUBSEQUENT PARTIAL FAILURE OF CONSIDERATION HAS NO EFFECT ON RIGHTS OF BONA FIDE ASSIGNEES.

Where a mortgage was given for the purpose of raising money to pay certain notes, not due when the mortgage was assigned, and of which the assignees had no notice, the fact that their assignor afterwards failed to pay all the notes as they came due did not affect the rights of the assignees.

5. SAME — FORECLOSURE — SECOND MORTGAGE RECORDED PRIOR TO FIRST TAKES PRIORITY TO EXTENT OF ACTUAL CONSIDERATION.

In a suit to foreclose a mortgage, a second mortgage given to raise funds to complete a building on the premises, which was recorded before the first mortgage, of which the second mortgagee had no notice, *held*, entitled to priority to the extent of the actual consideration therefor.

6. SAME—FRAUD — EXCESSIVE CONSIDERATION NOT CONCLUSIVE OF FRAUD.

That the consideration named in a mortgage is excessive is not of itself conclusive of fraud, but is some evidence that the court should consider in connection with the other facts and circumstances attending the transaction.

Appeal from Wayne; Collingwood (Charles B.), J., presiding. Submitted May 3, 1927. (Docket No. 127.) Decided June 24, 1927.

Bill by Albert E. Manning and another against Julius Rosenfeld, Leonard H. Gray, and others for the foreclosure of a mortgage. Defendants filed a cross-bill for affirmative relief. From a decree for defendants, plaintiffs appeal. Reversed, and decree entered for plaintiffs.

³Mortgages, 41 C. J. § 711; ⁴Id., 41 C. J. § 711; 19 R. C. L. 353; 3 R. C. L. Supp. 932; 6 R. C. L. Supp. 1115; ⁵Id., 41 C. J. §§ 487, 496; ⁶Id., 27 Cyc. p. 1619.

*Shapero & Shapero (Harold M. Shapero,* of counsel), for plaintiffs.

*A. Joseph Seltzer,* for defendants Rosenfeld.

*Joseph B. Beckenstein,* for defendant Gray.

McDONALD, J.    This is an appeal from a decree of the circuit court of Wayne county, Michigan, refusing foreclosure of a real estate mortgage in the amount claimed to be due thereon to the plaintiffs.    Two mortgages are involved in this suit.    They cover a lot located on the southwest corner of Carter and Linwood avenues, in the city of Detroit.    One mortgage was given by defendants Julius Rosenfeld and Rebecca Rosenfeld to Benjamin Braver, and by him assigned to the plaintiffs.    The consideration was $40,000. The other mortgage also recites a consideration of $40,000, and was given by the Rosenfelds to the defendant Leonard H. Gray.    This mortgage was of subsequent date to the Braver mortgage, but was recorded prior thereto, and Gray claims priority.    The plaintiffs filed this bill to foreclose their mortgage, to have the Gray mortgage set aside on the ground of fraud, and for other relief.    The defendants deny the validity of the Braver mortgage, and filed a cross-bill asking that it be set aside because it was without consideration and was obtained by fraud.

The following additional facts are necessary to an understanding of the questions involved:

On May 23, 1924, William J. Batten and wife owned in fee the property covered by the mortgages in question.    They sold it on contract to Abraham Stein for a consideration of $33,300, of which $5,000 was paid down, and the balance was to be paid within two years.    Stein assigned his interest in the contract to Benjamin Braver, one of the defendants.    The date of this assignment was August 4, 1924.    Braver orally agreed to sell his interest in the contract to Samuel

Rosenfeld, one of the defendants, for $5,000. Rosenfeld paid $1,000, and claims that he paid the balance in installments, and that it was fully paid by January, 1925. Braver says that it has never been paid. Rosenfeld received no written assignment of the contract, but the fact that he purchased it is not disputed. Rosenfeld bought for the purpose of building a 22-family apartment house on the lot. He had experience as a builder, but was a man of small means and limited credit. Braver was a well known contractor engaged in large building operations, and was reputed to be of sound financial responsibility. They were friends. Apparently, just as a friendly act, Braver agreed to assist Rosenfeld in financing the erection of the apartment house by procuring two loans for him as the work progressed, one for $90,000, and the other for $40,000, secured by first and second mortgages on the property. It was estimated that those amounts would be sufficient to complete the construction of the building. Rosenfeld had but $3,000. His brother Julius, one of the defendants, had $10,000. They combined their capital, and Julius Rosenfeld was given a half interest in the investment. Work on the building was commenced in August, 1924. By December the small capital of the Rosenfelds had become exhausted, and there was no money with which to continue the building operations, or to pay the outstanding obligations. Braver had failed in his promise to procure the necessary loans, so he consented to give his notes to the various contractors who were most urgent in demanding payment on their contracts. Subsequently, the Rosenfelds succeeded in making a loan for $75,000, secured by a first mortgage on the property. They paid Mr. Batten the balance due on the contract, and secured the title in the name of Julius Rosenfeld. At the same time they gave Braver a second mortgage for $40,000, which he was to sell

and assign to the plaintiffs to procure money with which to pay the notes that he had given to the contractors. This is the mortgage which the plaintiffs are seeking to foreclose. But the plaintiffs became interested in the property before this time. About December 4, 1924, it is claimed that Braver was indebted to them in the sum of $18,000. They made him an additional loan of $9,000, and took an assignment of the contract covering the property in question as security for the $27,000. It is claimed that this assignment was made without notice to the plaintiffs of Braver's transactions with the Rosenfelds. However, that is not very important because afterwards Braver secured a reassignment of the contract for the Rosenfelds. Referring again to the second mortgage of $40,000 which was given to Braver, and which he sold and assigned to the plaintiffs, we have said that this mortgage was given by the Rosenfelds with the understanding that Braver was to sell it and procure money with which to pay the notes that he had previously given to the contractors. The plaintiffs took over this mortgage, but the defendants claim that they did not receive any of the consideration. According to the claim of the plaintiffs, they agreed with Braver to pay him $32,000 for the mortgage, by crediting him with the $27,000 which he owed them, and giving him a check for $5,000. The mortgage was delivered to the plaintiffs on January 30, 1925. It was not recorded until February 20, 1925. In the meantime, Rosenfeld gave another mortgage of $40,000 to the defendant Leonard Gray. This mortgage was given on February 12, 1925, and recorded on February 13, 1925, seven days before the Braver mortgage was recorded by the plaintiffs. The day following, and on February 14, 1925, Samuel Rosenfeld wrote a letter to Braver in which he declared the Braver mortgage canceled.

It is the claim of Mr. Gray that he is a good-faith mortgagee, that there was an actual valuable consideration; that he took it without notice of the Braver mortgage held by the plaintiffs; that he recorded his mortgage prior to that of the plaintiffs; and that it is entitled to priority.

It is the claim of the Rosenfelds that the mortgage which the plaintiffs hold was secured in pursuance of a fraudulent conspiracy between them and Braver; that they took it without consideration, and with full knowledge of the defendants' rights and interests; that assuming they had no such knowledge, it is nonnegotiable on its face; and that, therefore, they took it subject to all of the defenses of the defendants against Braver.

The plaintiffs claim that they had no knowledge of defendants' interest in the property; that they paid a valuable consideration; that the notes and mortgage are negotiable, and, as *bona fide* purchasers in due course before maturity, they took them free from any defenses. They further insist that the Gray mortgage was fraudulent and without consideration, and is not entitled to priority.

On the hearing the circuit judge found that the plaintiffs had knowledge of the transaction between Braver and the Rosenfelds; that they were not good-faith purchasers; that their mortgage was nonnegotiable, and that, therefore, they acquired it subject to any defenses which the Rosenfelds would have had if it had remained in the hands of Braver; that there was no consideration for the mortgage, except such amounts as Braver had actually paid on the notes to contractors; and to that extent the plaintiffs were entitled to a decree of foreclosure, the amount thereof to be determined by reference to a commissioner for an accounting; that defendant Gray was a good-faith mortgagee, but that the actual consideration for his mort-

gage was $20,000, and to that extent it was entitled to priority.    From the decree entered the plaintiffs have appealed.

It is contended by the defendants that the Braver mortgage was nonnegotiable, that it was without consideration and was subject to that defense in the hands of the plaintiffs, his assignees, regardless of good faith or notice.

This mortgage was given pursuant to an agreement between Braver and Samuel Rosenfeld for the purpose of providing money with which to pay the notes that Braver had given to the contractors engaged in the construction of the building.    It was understood by Rosenfeld that the mortgage was to be sold to the plaintiff Larson at a discount of $8,000, and that Braver was to have $1,000 for his services.    Rosenfeld's dealings in relation to the mortgage were all with Braver.    He had no talk with Larson at any time. As to his understanding with Braver, Samuel Rosenfeld testified:

"*Q.* So, isn't it true, Mr. Rosenfeld, that it was understood he was to take the money—that Braver was to take the money he got from Larson or Manning from assigning the mortgage and use the money to pay the notes?

"*A.* Yes, sir.

"*Q.* You didn't care whether he gave the money to you and you paid the notes or whether he got the money and paid the notes?

"*A.* It amounted to the same thing.    *    *    *

"*Q.* And so, it was understood between you and Mr. Braver that the money was to be paid by Larson or Manning to Braver, and that you were to get it from Braver?

"*A.* Yes, sir.

"*Q.* And you knew, or understood, that Larson and Manning were to have no dealings with you direct?

"*A.* That was the way the understanding was.

"*Q.* And you were satisfied to have Mr. Larson or

239—Mich.—30.

Mr. Manning pay the money to Mr. Braver and for you to receive the money from Mr. Braver?

"*A.* Yes, sir.

"*Q.* And you were satisfied with that at the time the mortgage was executed?

"*A.* I believed Mr. Braver would pay it to me.

"*Q.* You trusted Mr. Braver?

"*A.* I trusted him.   *   *   *

"*Q.* Now, I think you did tell us, the last time you were on the stand, that the reason for your cancellation of the Braver mortgage was because he did not pay you any money, and because the notes were not paid. That is right is it not?

"*A.* Yes, sir."

Mr. Braver was considered to be a man of financial responsibility, and Rosenfeld was satisfied with the mortgage until Braver defaulted on some of the notes when they became due.

"*Q.* And when was the first time you knew Mr. Braver was no longer responsible, or was in financial difficulties?

"*A.* When some of the notes were unpaid.

"*Q.* When was that?

"*A.* That was during the first week in February.

"*Q.* So, in the first week in February, when he refused to honor these notes which he had given to contractors on the buildings, that is the first time you found out he was in financial difficulties, and it was immediately after that you attempted to cancel the mortgage?

"*A.* Yes, sir."

None of these notes were due at the time the mortgage was executed nor at the time of its assignment to the plaintiffs. The mortgage was for an actual and valuable consideration. It contained a recital that the consideration had been paid. It was made to be sold and assigned to plaintiffs. It was intended to be a valid and enforceable mortgage at that time; and, in fact, it was. The defendants could make no defense of lack of consideration at the time the

mortgage was assigned to the plaintiffs. The most that they can claim is that later there was a partial failure of consideration. That would not be a defense against the plaintiffs. They took it subject only to those defenses which existed at the time of its assignment to them. In thus stating the question, we are assuming that the mortgage was nonnegotiable, as the defendants claim, and that there was no fraud, a question which we will presently discuss. It is clear that, when the mortgage was assigned to the plaintiffs, there was no existing defense.

"Generally speaking, where the obligation secured by a mortgage is not negotiable, an assignee of the mortgage takes it subject to all defenses, existent at the time of the assignment, which might have been interposed by the mortgagor against the mortgagee or the assignor. * * * But the rules just stated are usually considered to relate only to defenses existing at the time of the assignment, those subsequently arising not affecting the interests of the assignee." 19 R. C. L. p. 353, § 125.

"Equities and defenses between the original parties arising after the assignment do not affect the rights of an assignee of a mortgage," etc. 41 C. J. p. 693.

So, if we should hold that the note and mortgage were nonnegotiable, it would not help the defendants, because they had no defenses at the time of its assignment. In this view of the matter, it becomes unnecessary to determine the question of nonnegotiability.

The question which logically follows is that of the alleged fraud and bad faith of the plaintiffs and Braver. The defendants say in their brief:

"Mortgage, Exhibit 1, was procured from the defendants by defendant Braver in pursuance of a fraudulent conspiracy between Braver and plaintiff Larson to defraud the defendants."

With the possible exception of Leonard Gray, all of the parties were dealing at arms' length. None of

them could qualify as a philanthropist. They were all experts in their respective lines. Larson was an expert in mortgage investments, and in extorting a sizeable bonus from the most ordinary loan. Braver could carry on several large building operations at one time, owe much, pay little, and maintain excellent credit. Samuel Rosenfeld was wise to the ways of the business world; he had experience, and thoroughly understood the methods to be employed in the building of a $175,000 apartment house with what has been aptly called a "shoe string." They were dealing at arms' length.

In what way was this mortgage fraudulently obtained from the defendants? It is charged that "Braver (either himself or with the connivance of his friend Larson) prevailed upon the defendant Rosenfeld to part with a $40,000 mortgage on his property without Rosenfeld receiving any part of the money Braver had represented Larson agreed to loan."

In making this charge of fraud, we think that counsel have overlooked the purpose of the mortgage as testified to by Mr. Rosenfeld. The giving of the mortgage became necessary because Braver had temporarily satisfied the contractors by giving them notes and checks at Rosenfeld's request, and for his accommodation. If the building operations were to continue these notes had to be paid when due. It was to Rosenfeld's interest to see that they were paid. As he had no money it was necessary for him to make a loan and give a mortgage to a third party, or to give a mortgage to Braver which he might sell and procure the means with which to pay the notes. The latter course was adopted, not because of any fraudulent inducement on the part of Braver, but because of Rosenfeld's necessity growing out of his attempt to construct a large apartment building without capital. That no other course was possible is well demonstrated

by the fact that before this mortgage was recorded, Rosenfeld was unable to give such a mortgage to a third party, and was ultimately compelled to do business with defendant Leonard Gray, who was a son-in-law of his brother Julius. Gray had no money, but owned three lots which he turned in at a valuation of $20,000, as the only consideration for a $40,000 mortgage. Rosenfeld did not need lots. He needed money, and if he could have secured it by giving a mortgage to a third party, he surely would not have dealt with Gray. In their brief, counsel for the defendants say: "Rosenfeld had to get money somewhere. He could not get it any other way." So it is fair to assume that the only course open to Rosenfeld was to give Braver this second mortgage that he might sell it and procure money with which to pay the notes; and that he took this course not because he was fraudulently prevailed upon to do so, but because of his necessity. He was perfectly satisfied to take this course. He was satisfied with the mortgage and never would have raised any question of fraud if Braver had not defaulted on some of the notes. The whole trouble arose because Braver did not keep his agreement, which was a collateral secret agreement, and did not affect the plaintiffs' interest as assignee. But the question is not what Braver did in fraud of the defendants' rights, but rather what he did in conjunction with the plaintiffs or their knowledge of fraudulent acts committed by him while acting alone. Did the plaintiffs know of the collateral agreement between Braver and Rosenfeld, under which the proceeds from the mortgage should be applied in payment of the notes which Braver had given to the contractors? The mortgage was not given with the understanding that the money obtained from its sale should be turned over to the defendants; nor was it the result of fraudulent inducements on the part of Braver; his wrong was

in not keeping his agreement with Rosenfeld. There is nothing in the record tending to show that the plaintiffs knew anything about what Braver intended to do, or knew that he had any collateral agreement with the defendants. Braver was reputed to be of sound financial responsibility. Rosenfeld had confidence in him; and Larson must have had, because, when Braver subsequently went into bankruptcy, Larson appeared as an unsecured creditor to the amount of $83,000. Apparently Larson trusted him just as Rosenfeld did. When Braver applied to the plaintiffs to sell the mortgage, he told them that he was the owner of the property, that he was selling it to Rosenfeld, and taking back this mortgage. Circumstances at that time corroborated this statement. Larson went to Mr. Batten, the owner of the fee. Mr. Batten did not know Rosenfeld had any interest. He knew that Braver was the contract purchaser. Rosenfeld had no writing, and had never notified the owner of his interest. There was nothing to connect Rosenfeld with the ownership; and there were no circumstances which would raise any suspicion in the mind of Larson that Braver was not telling the truth about the mortgage. Counsel for the defendants insist that Larson knew that Rosenfeld was not indebted to Braver in the sum of $40,000. There is no evidence that would justify us in so finding. The record is clear that Braver gave notes aggregating $40,000 to the contractors at Rosenfeld's request; and that the mortgage was given so that Braver could procure money to pay the notes when they became due, but it does not appear that Larson had any knowledge of that matter.

It is the defendants' contention that there was no consideration going to Braver for the assignment of the mortgage. We will not extend this opinion by an analysis of the testimony on that question. We

think that the record does not support the defendants' contention. The argument on this question is based largely on suspicion; and suspicion is not evidence. Our examination of the evidence leads to the conclusion that the plaintiffs are *bona fide* purchasers of the mortgage for value, and that in their hands it is not subject to any of the defenses claimed by the defendants.

The only question that remains to be considered relates to the mortgage of the defendant Leonard Gray. There is no doubt that when Braver breached his agreement with Samuel Rosenfeld by failing to use the proceeds from the sale of his mortgage in payment of the notes which had been given to the contractors, Rosenfeld became seriously handicapped in continuing the construction of the building. The record does not show the actual number of notes paid by Braver. He paid some of them, but a goodly number remained unpaid. Rosenfeld needed more money. The only man he could get to accept another mortgage on the property was Gray. So a mortgage of $40,000 was given to Gray with the understanding that, if possible, the mortgage was to be sold and the proceeds used to pay Gray for his lots, on which a valuation of $20,000 had been placed, and the balance turned over to Rosenfeld for use in continuing the building operations.

It is the contention of the plaintiffs that the Gray mortgage was fraudulent in fact and in law. Undoubtedly, Gray had two purposes in accepting this mortgage: *First,* to dispose of his lots, and *second,* to assist the Rosenfelds in completing their building. Rosenfeld's purpose was to get money to pay his creditors, not to defraud them. It seems to have been an honest business transaction. There was an actual consideration of $20,000, and to that extent it is a valid mortgage. It was recorded prior to the plaintiffs' mortgage; and, at the time it was accepted and

recorded by Gray, he had no knowledge, either actual or constructive, of the other mortgage. We think that he was a good-faith mortgagee. The claim that it was fraudulent in law is based upon the assumption that there was a secret agreement between Gray and Rosenfeld, and that to carry out that agreement Rosenfeld retained possession of the mortgage. As we understand it, this mortgage has not been sold. It is still in the possession of Gray. There is no evidence of any agreement that would affect the validity of the mortgage. The mere fact that the consideration named was excessive is not of itself conclusive of fraud. It is some evidence, however, that the court should consider, but when considered in connection with the other facts and circumstances attending this transaction, it is not sufficient to establish fraud. We think that it is a valid mortgage for $20,000, and that if it is subject to any legal defenses, they are not available to the plaintiffs in this action.

In taking the testimony in this case, counsel wandered far afield, but we have read the voluminous record with close attention, and are persuaded that the plaintiffs have a valid mortgage, and are entitled to its foreclosure, subject only to the Gray mortgage to the extent of $20,000.

A decree will be entered in accordance with this opinion. No costs.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, WIEST and CLARK, JJ., concurred.